## GREEN TREE FINANCIAL CORP., nka CONSECO FINANCE CORP. v. BAZZLE ET AL., IN A REPRESENTATIVE CAPACITY ON BEHALF OF A CLASS AND FOR ALL OTHERS SIMILARLY SITUATED, ET AL.

No. 02–634.   Argued April 22, 2003—Decided June 23, 2003

BREYER, J., announced the judgment of the Court and delivered an opinion, in which SCALIA, SOUTER, and GINSBURG, JJ., joined. STEVENS, J., filed an opinion concurring in the judgment and dissenting in part, *post*, p. 454. REHNQUIST, C. J., filed a dissenting opinion, in which O'CONNOR and KENNEDY, JJ., joined, *post*, p. 455. THOMAS, J., filed a dissenting opinion, *post*, p. 460.

*Carter G. Phillips* argued the cause for petitioner. With him on the briefs were *Paul J. Zidlicky, Alan S. Kaplinsky, Mark J. Levin, Wilburn Brewer, Jr., Robert C. Byrd,* and *Herbert W. Hamilton.*

*Cornelia T. L. Pillard* argued the cause for respondents. With her on the brief were *Mary Leigh Arnold, Steven W. Hamm, Bradford P. Simpson, B. Randall Dong, T. Alexander Beard, Charles L. Dibble,* and *Charles Richard Kelly.**

---

*Briefs of *amici curiae* urging reversal were filed for the American Bankers Association et al. by *Louis R. Cohen, Christopher R. Lipsett, Eric J. Mogilnicki,* and *Michael D. Leffel;* for the Chamber of Commerce of the United States by *Evan M. Tager, Miriam R. Nemetz, Jeffrey W. Sarles,* and *Robin S. Conrad;* for the National Council of Chain Restaurants by *Robert P. Floyd III;* for DirectTV, Inc., by *Christopher Landau* and *Dale H. Oliver;* for the Equal Employment Advisory Council by *Ann Elizabeth Reesman* and *Rae T. Vann;* for the New England Legal Foundation et al. by *Christopher M. Mason* and *Michael E. Malamut;* and for the Washington Legal Foundation by *Daniel J. Popeo* and *Richard A. Samp.*

Briefs of *amici curiae* urging affirmance were filed for the AARP by *Stacy J. Canan, Michael R. Schuster, Deborah M. Zuckerman, Nina Simon,* and *Jean Constantine-Davis;* for Law Professors by *David S. Schwartz, Richard M. Alderman, Robert Belton, Dwight Golann, Catherine Fisk, Peter Linzer, Jeffrey W. Stempel, Clyde W. Summers, Katherine*

JUSTICE BREYER announced the judgment of the Court and delivered an opinion, in which JUSTICE SCALIA, JUSTICE SOUTER, and JUSTICE GINSBURG join.

This case concerns contracts between a commercial lender and its customers, each of which contains a clause providing for arbitration of all contract-related disputes. The Supreme Court of South Carolina held (1) that the arbitration clauses are silent as to whether arbitration might take the form of class arbitration, and (2) that, in that circumstance, South Carolina law interprets the contracts as permitting class arbitration. 351 S. C. 244, 569 S. E. 2d 349 (2002). We granted certiorari to determine whether this holding is consistent with the Federal Arbitration Act, 9 U. S. C. § 1 *et seq.*

We are faced at the outset with a problem concerning the contracts' silence. Are the contracts in fact silent, or do they forbid class arbitration as petitioner Green Tree Financial Corp. contends? Given the South Carolina Supreme Court's holding, it is important to resolve that question. But we cannot do so, not simply because it is a matter of state law, but also because it is a matter for the arbitrator to decide. Because the record suggests that the parties have not yet received an arbitrator's decision on that question of contract interpretation, we vacate the judgment of the South Carolina Supreme Court and remand the case so that this question may be resolved in arbitration.

I

In 1995, respondents Lynn and Burt Bazzle secured a home improvement loan from petitioner Green Tree. The

*Van Wezel Stone,* and *Gerald J. Thain;* for the Lawyers' Committee for Civil Rights Under Law et al. by *Richard T. Seymour, Paul W. Mollica, Gary T. Johnson, Stuart Meiklejohn, Norman Redlich, Barbara R. Arnwine, Thomas J. Henderson, Dennis C. Hayes, Vincent A. Eng, Elaine R. Jones, Norman J. Chachkin, Robert H. Stroup, Judith L. Lichtman,* and *Jocelyn C. Frye;* and for Trial Lawyers for Public Justice by *F. Paul Bland, Jr.*

Bazzles and Green Tree entered into a contract, governed by South Carolina law, which included the following arbitration clause:

> "ARBITRATION—All disputes, claims, or controversies arising from or relating to this contract or the relationships which result from this contract . . . *shall be resolved by binding arbitration by one arbitrator selected by us with consent of you.* This arbitration contract is made pursuant to a transaction in interstate commerce, and shall be governed by the Federal Arbitration Act at 9 U. S. C. section 1. . . . THE PARTIES VOLUNTARILY AND KNOWINGLY WAIVE ANY RIGHT THEY HAVE TO A JURY TRIAL, EITHER PURSUANT TO ARBITRATION UNDER THIS CLAUSE OR PURSUANT TO A COURT ACTION BY US (AS PROVIDED HEREIN). . . . The parties agree and understand that the arbitrator shall have all powers provided by the law and the contract. These powers shall include all legal and equitable remedies, including, but not limited to, money damages, declaratory relief, and injunctive relief." App. 34 (emphasis added, capitalization in original).

Respondents Daniel Lackey and George and Florine Buggs entered into loan contracts and security agreements for the purchase of mobile homes with Green Tree. These agreements contained arbitration clauses that were, in all relevant respects, identical to the Bazzles' arbitration clause. (Their contracts substitute the word "you" with the word "Buyer[s]" in the italicized phrase.) 351 S. C., at 264, n. 18, 569 S. E. 2d, at 359, n. 18 (emphasis deleted).

At the time of the loan transactions, Green Tree apparently failed to provide these customers with a legally required form that would have told them that they had a right to name their own lawyers and insurance agents and would have provided space for them to write in those names. See

S. C. Code Ann. § 37-10-102 (West 2002). The two sets of customers before us now as respondents each filed separate actions in South Carolina state courts, complaining that this failure violated South Carolina law and seeking damages.

In April 1997, the Bazzles asked the court to certify their claims as a class action. Green Tree sought to stay the court proceedings and compel arbitration. On January 5, 1998, the court both (1) certified a class action and (2) entered an order compelling arbitration. App. 7. Green Tree then selected an arbitrator with the Bazzles' consent. And the arbitrator, administering the proceeding as a class arbitration, eventually awarded the class $10,935,000 in statutory damages, along with attorney's fees. The trial court confirmed the award, App. to Pet. for Cert. 27a–35a, and Green Tree appealed to the South Carolina Court of Appeals claiming, among other things, that class arbitration was legally impermissible.

Lackey and the Buggses had earlier begun a similar court proceeding in which they, too, sought class certification. Green Tree moved to compel arbitration. The trial court initially denied the motion, finding the arbitration agreement unenforceable, but Green Tree pursued an interlocutory appeal and the State Court of Appeals reversed. *Lackey* v. *Green Tree Financial Corp.*, 330 S. C. 388, 498 S. E. 2d 898 (1998). The parties then chose an arbitrator, indeed the same arbitrator who was subsequently selected to arbitrate the Bazzles' dispute.

In December 1998, the arbitrator certified a class in arbitration. App. 18. The arbitrator proceeded to hear the matter, ultimately ruled in favor of the class, and awarded the class $9,200,000 in statutory damages in addition to attorney's fees. The trial court confirmed the award. App. to Pet. for Cert. 36a–54a. Green Tree appealed to the South Carolina Court of Appeals claiming, among other things, that class arbitration was legally impermissible.

The South Carolina Supreme Court withdrew both cases from the Court of Appeals, assumed jurisdiction, and consolidated the proceedings. 351 S. C., at 249, 569 S. E. 2d, at 351. That court then held that the contracts were silent in respect to class arbitration, that they consequently authorized class arbitration, and that arbitration had properly taken that form. We granted certiorari to consider whether that holding is consistent with the Federal Arbitration Act.

## II

The South Carolina Supreme Court's determination that the contracts are silent in respect to class arbitration raises a preliminary question. Green Tree argued there, as it argues here, that the contracts are not silent—that they forbid class arbitration. And we must deal with that argument at the outset, for if it is right, then the South Carolina court's holding is flawed on its own terms; that court neither said nor implied that it would have authorized class arbitration had the parties' arbitration agreement forbidden it.

Whether Green Tree is right about the contracts themselves presents a disputed issue of contract interpretation. THE CHIEF JUSTICE believes that Green Tree is right; indeed, that Green Tree is so clearly right that we should ignore the fact that state law, not federal law, normally governs such matters, see *post*, at 454 (STEVENS, J., concurring in judgment and dissenting in part), and reverse the South Carolina Supreme Court outright, see *post*, at 458–460 (REHNQUIST, C. J., dissenting). THE CHIEF JUSTICE points out that the contracts say that disputes "shall be resolved . . . by one arbitrator selected by us [Green Tree] with consent of you [Green Tree's customer]." App. to Pet. for Cert. 110a. See *post*, at 458. And it finds that class arbitration is clearly inconsistent with this requirement. After all, class arbitration involves an arbitration, not simply between Green Tree and a *named customer*, but also between Green Tree and *other* (represented) customers, all taking place before the

arbitrator chosen to arbitrate the initial, *named customer's* dispute.

We do not believe, however, that the contracts' language is as clear as THE CHIEF JUSTICE believes. The class arbitrator *was* "selected by" Green Tree "with consent of" Green Tree's customers, the named plaintiffs. And insofar as the other class members agreed to proceed in class arbitration, they consented as well.

Of course, Green Tree did *not* independently select *this* arbitrator to arbitrate its disputes with the *other* class members. But whether the contracts contain this additional requirement is a question that the literal terms of the contracts do not decide. The contracts simply say (I) "selected by us [Green Tree]." And that is literally what occurred. The contracts do not say (II) "selected by us [Green Tree] to arbitrate this dispute and no other (even identical) dispute with another customer." The question whether (I) in fact implicitly means (II) is the question at issue: Do the contracts forbid class arbitration? Given the broad authority the contracts elsewhere bestow upon the arbitrator, see, *e. g.,* App. to Pet. for Cert. 110a (the contracts grant to the arbitrator "all powers," including certain equitable powers "provided by the law and the contract"), the answer to this question is not completely obvious.

At the same time, we cannot automatically accept the South Carolina Supreme Court's resolution of this contract-interpretation question. Under the terms of the parties' contracts, the question—whether the agreement forbids class arbitration—is for the arbitrator to decide. The parties agreed to submit to the arbitrator "*[a]ll* disputes, claims, or controversies arising from or relating to this contract or the relationships which result from this contract." *Ibid.* (emphasis added). And the dispute about what the arbitration contract in each case means (*i. e.,* whether it forbids the use of class arbitration procedures) is a dispute "relating to this contract" and the resulting "relationships." Hence the

parties seem to have agreed that an arbitrator, not a judge, would answer the relevant question. See *First Options of Chicago, Inc.* v. *Kaplan,* 514 U. S. 938, 943 (1995) (arbitration is a "matter of contract"). And if there is doubt about that matter—about the "'scope of arbitrable issues'"—we should resolve that doubt "'in favor of arbitration.'" *Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.,* 473 U. S. 614, 626 (1985).

In certain limited circumstances, courts assume that the parties intended courts, not arbitrators, to decide a particular arbitration-related matter (in the absence of "clea[r] and unmistakabl[e]" evidence to the contrary). *AT&T Technologies, Inc.* v. *Communications Workers,* 475 U. S. 643, 649 (1986). These limited instances typically involve matters of a kind that "contracting parties would likely have expected a court" to decide. *Howsam* v. *Dean Witter Reynolds, Inc.,* 537 U. S. 79, 83 (2002). They include certain gateway matters, such as whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy. See generally *Howsam, supra.* See also *John Wiley & Sons, Inc.* v. *Livingston,* 376 U. S. 543, 546–547 (1964) (whether an arbitration agreement survives a corporate merger); *AT&T, supra,* at 651–652 (whether a labor-management layoff controversy falls within the scope of an arbitration clause).

The question here—whether the contracts forbid class arbitration—does not fall into this narrow exception. It concerns neither the validity of the arbitration clause nor its applicability to the underlying dispute between the parties. Unlike *First Options,* the question is not whether the parties wanted a judge or an arbitrator to decide *whether they agreed to arbitrate a matter.* 514 U. S., at 942–945. Rather the relevant question here is what *kind of arbitration proceeding* the parties agreed to. That question does not concern a state statute or judicial procedures, cf. *Volt Information Sciences, Inc.* v. *Board of Trustees of Leland Stanford*

*Junior Univ.*, 489 U. S. 468, 474–476 (1989). It concerns contract interpretation and arbitration procedures. Arbitrators are well situated to answer that question. Given these considerations, along with the arbitration contracts' sweeping language concerning the scope of the questions committed to arbitration, this matter of contract interpretation should be for the arbitrator, not the courts, to decide. Cf. *Howsam, supra,* at 83 (finding for roughly similar reasons that the arbitrator should determine a certain procedural "gateway matter").

## III

With respect to this underlying question—whether the arbitration contracts forbid class arbitration—the parties have not yet obtained the arbitration decision that their contracts foresee. As far as concerns the *Bazzle* plaintiffs, the South Carolina Supreme Court wrote that the "trial court" issued "an order granting class certification" and the arbitrator subsequently "administered" class arbitration proceedings "without further involvement of the trial court." 351 S. C., at 250–251, 569 S. E. 2d, at 352. Green Tree adds that "the class arbitration was imposed on the parties and the arbitrator by the South Carolina trial court." Brief for Petitioner 30. Respondents now deny that this was so, Brief for Respondents 13, but we can find no convincing record support for that denial.

As far as concerns the *Lackey* plaintiffs, what happened in arbitration is less clear. On the one hand, the *Lackey* arbitrator (the same individual who later arbitrated the *Bazzle* dispute) wrote: "*I* determined that a class action should proceed in arbitration based upon *my* careful review of the broadly drafted arbitration clause prepared by Green Tree." App. to Pet. for Cert. 84a (emphasis added). And respondents suggested at oral argument that the arbitrator's decision was independently made. Tr. of Oral Arg. 39.

On the other hand, the *Lackey* arbitrator decided this question after the South Carolina trial court had determined

454

that the identical contract in the *Bazzle* case authorized class arbitration procedures. And there is no question that the arbitrator was aware of the *Bazzle* decision, since the *Lackey* plaintiffs had argued to the arbitrator that it should impose class arbitration procedures in part because the state trial court in *Bazzle* had done so. Record on Appeal 516–518. In the court proceedings below (where Green Tree took the opposite position), the *Lackey* plaintiffs maintained that "to the extent" the arbitrator decided that the contracts permitted class procedures (in the *Lackey* case or the *Bazzle* case), "it was a reaffirmation and/or adoption of [the *Bazzle* c]ourt's prior determination." Record on Appeal 1708, n. 2. See also App. 31–32, n. 2.

On balance, there is at least a strong likelihood in *Lackey* as well as in *Bazzle* that the arbitrator's decision reflected a court's interpretation of the contracts rather than an arbitrator's interpretation. That being so, we remand the case so that the arbitrator may decide the question of contract interpretation—thereby enforcing the parties' arbitration agreements according to their terms. 9 U. S. C. § 2; *Volt, supra,* at 478–479.

The judgment of the South Carolina Supreme Court is vacated, and the case is remanded for further proceedings.

*So ordered.*

JUSTICE STEVENS, concurring in the judgment and dissenting in part.

The parties agreed that South Carolina law would govern their arbitration agreement. The Supreme Court of South Carolina has held as a matter of state law that class-action arbitrations are permissible if not prohibited by the applicable arbitration agreement, and that the agreement between these parties is silent on the issue. 351 S. C. 244, 262–266, 569 S. E. 2d 349, 359–360 (2002). There is nothing in the Federal Arbitration Act that precludes either of these deter-

minations by the Supreme Court of South Carolina. See *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U. S. 468, 475–476 (1989).

Arguably the interpretation of the parties' agreement should have been made in the first instance by the arbitrator, rather than the court. See *Howsam v. Dean Witter Reynolds, Inc.*, 537 U. S. 79 (2002). Because the decision to conduct a class-action arbitration was correct as a matter of law, and because petitioner has merely challenged the merits of that decision without claiming that it was made by the wrong decisionmaker, there is no need to remand the case to correct that possible error.

Accordingly, I would simply affirm the judgment of the Supreme Court of South Carolina. Were I to adhere to my preferred disposition of the case, however, there would be no controlling judgment of the Court. In order to avoid that outcome, and because JUSTICE BREYER's opinion expresses a view of the case close to my own, I concur in the judgment. See *Screws v. United States*, 325 U. S. 91, 134 (1945) (Rutledge, J., concurring in result).

CHIEF JUSTICE REHNQUIST, with whom JUSTICE O'CONNOR and JUSTICE KENNEDY join, dissenting.

The parties entered into contracts with an arbitration clause that is governed by the Federal Arbitration Act (FAA), 9 U. S. C. § 1 *et seq.* The Supreme Court of South Carolina held that arbitration under the contracts could proceed as a class action even though the contracts do not by their terms permit class-action arbitration. The plurality now vacates that judgment and remands the case for the arbitrator to make this determination. I would reverse because this determination is one for the courts, not for the arbitrator, and the holding of the Supreme Court of South Carolina contravenes the terms of the contracts and is therefore pre-empted by the FAA.

The agreement to arbitrate involved here, like many such agreements, is terse. Its operative language is contained in one sentence:

"All disputes, claims, or controversies arising from or relating to this contract or the relationships which result from this contract . . . shall be resolved by binding arbitration by one arbitrator selected by us with consent of you." App. 34.

The decision of the arbitrator on matters agreed to be submitted to him is given considerable deference by the courts. See *Major League Baseball Players Assn.* v. *Garvey,* 532 U. S. 504, 509–510 (2001) *(per curiam).* The Supreme Court of South Carolina relied on this principle in deciding that the arbitrator in this case did not abuse his discretion in allowing a class action. 351 S. C. 244, 266–268, 569 S. E. 2d 349, 361–362 (2002). But the decision of *what* to submit to the arbitrator is a matter of contractual agreement by the parties, and the interpretation of that contract is for the court, not for the arbitrator. As we stated in *First Options of Chicago, Inc.* v. *Kaplan,* 514 U. S. 938, 945 (1995):

"[G]iven the principle that a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration, one can understand why courts might hesitate to interpret silence or ambiguity on the 'who should decide arbitrability' point as giving the arbitrators that power, for doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide."

Just as fundamental to the agreement of the parties as *what* is submitted to the arbitrator is to *whom* it is submitted. Those are the two provisions in the sentence quoted above, and it is difficult to say that one is more important than the other. I have no hesitation in saying that the choice of arbitrator is as important a component of the agree-

ment to arbitrate as is the choice of what is to be submitted to him.

Thus, this case is controlled by *First Options*, and not by our more recent decision in *Howsam* v. *Dean Witter Reynolds, Inc.*, 537 U. S. 79 (2002). There, the agreement provided that any dispute "shall be determined by arbitration before any self-regulatory organization or exchange of which Dean Witter is a member." *Id.*, at 81 (internal quotation marks omitted). Howsam chose the National Association of Securities Dealers (NASD), and agreed to that organization's "Uniform Submission Agreement" which provided that the arbitration would be governed by NASD's "Code of Arbitration Procedure." *Id.*, at 82. That code, in turn, contained a limitation. This Court held that it was for the arbitrator to interpret that limitation provision:

> " ' "[P]rocedural" questions which grow out of the dispute and bear on its final disposition' are presumptively *not* for the judge, but for an arbitrator, to decide. *John Wiley* [*& Sons, Inc.* v. *Livingston,* 376 U. S. 543, 557 (1964)] (holding that an arbitrator should decide whether the first two steps of a grievance procedure were completed, where these steps are prerequisites to arbitration). So, too, the presumption is that the arbitrator should decide 'allegation[s] of waiver, delay, or a like defense to arbitrability.' " *Id.*, at 84.

I think that the parties' agreement as to how the arbitrator should be selected is much more akin to the agreement as to what shall be arbitrated, a question for the courts under *First Options*, than it is to "allegations of waiver, delay, or like defenses to arbitrability," which are questions for the arbitrator under *Howsam.*

"States may regulate contracts, including arbitration clauses, under general contract law principles," *Allied-Bruce Terminix Cos.* v. *Dobson,* 513 U. S. 265, 281 (1995). "[T]he interpretation of private contracts is ordinarily a question of

state law, which this Court does not sit to review." *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.,* 489 U. S. 468, 474 (1989). But "state law may nonetheless be pre-empted to the extent that it actually conflicts with federal law—that is, to the extent that it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.,* at 477 (quoting *Hines v. Davidowitz,* 312 U. S. 52, 67 (1941)).

The parties do not dispute that these contracts fall within the coverage of the FAA. 351 S. C., at 257, 569 S. E. 2d, at 355. The "central purpose" of the FAA is "to ensure that private agreements to arbitrate are enforced according to their terms." *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U. S. 52, 53–54 (1995) (quoting *Volt, supra,* at 479 (internal quotation marks omitted)). See also *Doctor's Associates, Inc. v. Casarotto,* 517 U. S. 681, 688 (1996); *First Options, supra,* at 947. In other words, Congress sought simply to "place such agreements upon the same footing as other contracts." *Volt, supra,* at 474 (quoting *Scherk v. Alberto-Culver Co.,* 417 U. S. 506, 511 (1974) (internal quotation marks omitted)). This aim "requires that we rigorously enforce agreements to arbitrate," *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U. S. 614, 626 (1985) (quoting *Dean Witter Reynolds Inc. v. Byrd,* 470 U. S. 213, 221 (1985) (internal quotation marks omitted)), in order to "give effect to the contractual rights and expectations of the parties," *Volt, supra,* at 479. See also *Mitsubishi Motors, supra,* at 626 ("[A]s with any other contract, the parties' intentions control").

Under the FAA, "parties are generally free to structure their arbitration agreements as they see fit." *Volt, supra,* at 479. Here, the parties saw fit to agree that any disputes arising out of the contracts "shall be resolved by binding arbitration by one arbitrator selected by us with consent of you." App. 34. Each contract expressly defines "us" as petitioner, and "you" as the respondent or respondents

named in that specific contract. *Id.*, at 33 ("'We' and 'us' means the Seller *above*, its successors and assigns"; "'You' and 'your' means each Buyer *above* and guarantor, jointly and severally" (emphasis added)). Each contract also specifies that it governs all "disputes . . . arising from . . . *this* contract or the relationships which result from *this* contract." *Id.*, at 34 (emphasis added). These provisions, which the plurality simply ignores, see *ante*, at 450–451, make quite clear that petitioner must select, and each buyer must agree to, a particular arbitrator for disputes between petitioner and that specific buyer.

While the observation of the Supreme Court of South Carolina that the agreement of the parties was silent as to the availability of class-wide arbitration is literally true, the imposition of class-wide arbitration contravenes the just-quoted provision about the selection of an arbitrator. To be sure, the arbitrator that administered the proceedings was "selected by [petitioner] with consent of" the Bazzles, Lackey, and the Buggses. App. 34–36. But petitioner had the contractual right to choose an arbitrator for each dispute with the other 3,734 individual class members, and this right was denied when the same arbitrator was foisted upon petitioner to resolve those claims as well. Petitioner may well have chosen different arbitrators for some or all of these other disputes; indeed, it would have been reasonable for petitioner to do so, in order to avoid concentrating all of the risk of substantial damages awards in the hands of a single arbitrator. As petitioner correctly concedes, Brief for Petitioner 32, 42, the FAA does not prohibit parties from choosing to proceed on a classwide basis. Here, however, the parties simply did not so choose.

"Arbitration under the Act is a matter of consent, not coercion." *Volt, supra,* at 479. Here, the Supreme Court of South Carolina imposed a regime that was contrary to the express agreement of the parties as to how the arbitrator would be chosen. It did not enforce the "agreemen[t]

to arbitrate . . . according to [its] terms." *Mastrobuono, supra,* at 54 (internal quotation marks omitted). I would therefore reverse the judgment of the Supreme Court of South Carolina.

JUSTICE THOMAS, dissenting.

I continue to believe that the Federal Arbitration Act (FAA), 9 U. S. C. § 1 *et seq.,* does not apply to proceedings in state courts. *Allied-Bruce Terminix Cos.* v. *Dobson,* 513 U. S. 265, 285–297 (1995) (THOMAS, J., dissenting). See also *Doctor's Associates, Inc.* v. *Casarotto,* 517 U. S. 681, 689 (1996) (THOMAS, J., dissenting). For that reason, the FAA cannot be a ground for pre-empting a state court's interpretation of a private arbitration agreement. Accordingly, I would leave undisturbed the judgment of the Supreme Court of South Carolina.